Lisel M. Ferguson (Bar No. 207637)
   lisel.ferguson@procopio.com
Anthony J. Dain (Bar No. 98947)
   anthony.dain@procopio.com
Matthew B. Shields (Bar No. 308553)
   matthew.shields@procopio.com
PROCOPIO, CORY, HARGREAVES &
   SAVITCH LLP
525 B Street, Suite 2200
San Diego, CA  92101
Telephone: 619.238.1900
Facsimile: 619.235.0398

*Attorneys for Plaintiffs,*
ALLAN CAMAISA, MEGAN CAMAISA, and
CHESTER MEADOWS, LLC

# UNITED STATES DISTRICT COURT

## FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ALLAN J. CAMAISA, an individual; MEGAN CAMAISA, an individual; CHESTER MEADOWS, LLC, a California limited liability company,<br><br>       Plaintiffs,<br><br>v.<br><br>TANYA LEVORCHICK, an individual; UNITED STATES EQUESTRIAN FEDERATION, INC., a Kentucky corporation,<br><br>       Defendants. | Case No. **'17CV1322 JM   BLM**<br><br>**PLAINTIFFS' COMPLAINT FOR:**<br>**(1) BREACH OF CONTRACT;**<br>**(2) PROMISSORY ESTOPPEL;**<br>**(3) BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING;**<br>**(4) FRAUDULENT MISREPRESENTATION;**<br>**(5) FRAUDULENT CONCEALMENT;**<br>**(6) CONVERSION OF STALLIONS;**<br>**(7) CONVERSION OF RIDING TACK AND SUPPLIES;**<br>**(8) INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS; AND**<br>**(9) NEGLIGENCE**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs ALLAN J. CAMAISA ("Mr. Camaisa"), MEGAN CAMAISA ("Ms. Camaisa"), and CHESTER MEADOWS, LLC ("CML") (collectively "Plaintiffs") allege the following facts against Defendants TANYA LEVORCHICK ("Ms. Levorchick") and UNITED STATES EQUESTRIAN FEDERATION, INC. ("USEF") (collectively, "Defendants"):

## NATURE OF ACTION

1.     This action generally relates to Ms. Levorchick's fraudulent conversion of Plaintiffs' stallion horses, riding tack, and supplies.  Ms. Levorchick breached a variety of contractual obligations owed to Plaintiffs, and she induced Plaintiffs to rely on her promises to their detriment.  Ms. Levorchick also fraudulently concealed information from Plaintiffs that she was required to disclose.  Further, Ms. Levorchick fraudulently misrepresented information to USEF, who, despite being repeatedly advised of Ms. Levorchick's fraud, nevertheless negligently facilitated Ms. Levorchick's fraud by transferring ownership of Plaintiffs' stallion horses to Ms. Levorchick.

## THE PARTIES

2.     Plaintiff Mr. Camaisa is, and at all times herein mentioned was, an individual residing in San Diego, California.

3.     Plaintiff Ms. Camaisa is, and at all times herein mentioned was, an individual residing in San Diego, California.

4.     Plaintiff CML is, and at all times herein mentioned was, a limited liability company jointly owned and operated by Mr. Camaisa and Ms. Camaisa and located in San Diego, California.

5.     Based on information and belief, Defendant Ms. Levorchick is an individual whose primary residence is in or around Prague, Czech Republic.

6.     Based on information and belief, Ms. Levorchick is physically present in the Czech Republic and intends to remain there indefinitely.

7.     Based on information and belief, Defendant USEF is a corporation

located in Lexington, Kentucky.

8.      This case primarily concerns the property rights and contractual rights related to two grand prix stallions: Zanzibar, with a date of birth of February 14, 2004, and Coco d'Eclipse, with a date of birth of August 5, 2005 (collectively, "Stallions").  Ms. Levorchick recently transported the Stallions out of the United States to the Czech Republic, where the Stallions currently remain.

## JURISDICTION AND VENUE

9.      Plaintiffs brings this action under federal diversity jurisdiction, 28 U.S.C. section 1332, as the parties are completely diverse in citizenship and the amount in controversy exceeds $75,000.

10.     This Court has personal jurisdiction over Ms. Levorchick because she purposely availed herself of the opportunity to conduct commercial activities in this District by offering her services in this District and in the State of California.  Ms. Levorchick is further subject to the jurisdiction of this Court by virtue of her substantial contacts with California, including her participation in the acts and events occurring within this District as described herein.

11.     This Court has personal jurisdiction over USEF because it purposely availed itself of the opportunity to conduct commercial activities in this District by offering its services in this District and in the State of California.  USEF is further subject to the jurisdiction of this Court by virtue of its substantial contacts with California, including its participation in the acts and events occurring within this District as described herein.

12.     Venue in this District is proper pursuant to 28 U.S.C. section 1391(b)(2), because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.

## GENERAL ALLEGATIONS

## Ms. Levorchick Duties as Plaintiffs' Horse Broker and Trainer for the Stallions

13.     Plaintiff CML purchased Zanzibar on September 20, 2013, along with

3

another horse called Baloubina, through a bill of sale for €477,800 (approximately $646,320 at the time).  Zanzibar was valued at approximately $600,000 for purposes of that sale.  Plaintiffs purchased Zanzibar in Europe and shipped to the United States, with Ms. Levorchick acting as their horse broker.

14.     A true and correct copy of the bill of sale for September 20, 2013, purchase of Zanzibar is attached hereto as "Exhibit A."

15.     Plaintiffs Ms. Camaisa and Mr. Camaisa purchased Coco d'Eclipse on June 25, 2015, through a bill of sale for $240,000.  Plaintiffs purchased Coco d'Eclipse in Europe and shipped to the United States, with Ms. Levorchick acting as their horse broker.

16.     A true and correct copy of the bill of sale for June 25, 2015, purchase of Coco d'Eclipse is attached hereto as "Exhibit B."

17.     At all relevant points in time, Plaintiffs are and have been the co-owners of the Stallions.

18.     Plaintiffs' intention when purchasing the Stallions and paying their training and showing fees was to increase the Stallions' value and to sell them for a profit.

19.     Ms. Levorchick actively encouraged Plaintiffs to purchase the Stallions advised Plaintiffs about the Stallions' value.

20.     On or about September 23, 2013, Ms. Levorchick entered into a General Service Agreement ("GSA") with CML, by which Ms. Levorchick agreed to provide training services for the Plaintiffs' horses.  A true and correct copy of the GSA is attached hereto as "Exhibit C."

21.     Among other things, the GSA required Ms. Levorchick to provide monthly training for the horses; coordinate all show schedules; provide a strategic plan of showings and advancements in the levels of the horses; attract potential buyers and or brokers; ride the horses in show events; oversee veterinary care including breeding; design specific feeding plans; prepare travel plans for the horses;

and arrange a skilled alternate rider for events that Ms. Levorchick may not physically compete in.

22.  The GSA required that Ms. Levorchick's training services would include best efforts to show the horses in effort to solicit inquiries for their eventual sale to the highest bidder.

23.  The GSA required that Ms. Levorchick submit all inquiries for the eventual sale of the horses in writing to Plaintiffs.

24.  The GSA stated that the burden was on Ms. Levorchick to request written email approval to attend any shows that may require expenses for Plaintiffs, and that all expenses will be approved by email by Plaintiffs.

25.  The GSA stated that the parties agreed to do everything necessary to ensure that the terms of the agreement take effect.

26.  The GSA stated that Ms. Levorchick understood the end objective of the agreement was to sell horses at a profit, and that priority would be given to this objective above all other endeavors for the term of the agreement once the agreement took effect and was executed.

27.  Ms. Levorchick also acted as the exclusive rider for Plaintiffs' Stallions in the United States and Europe.  Plaintiffs paid 100% of Ms. Levorchick's expenses related to the Stallions for over three years.

28.  Plaintiffs have spent approximately $500,000 to $750,000, if not more, paying for training and show fees related to the Stallions.  These fees essentially sponsored Ms. Levorchick's riding of the Stallions over the past three years.

29.  Over time, Plaintiffs determined that their prospects were diminishing for selling the Stallions for a profit over their purchase prices and training fees.

30.  Additionally, Plaintiffs came to believe that Ms. Levorchick did not act in good faith to sell the Stallions when Plaintiffs advised her to start looking for buyers.

31.  Unbeknownst to Plaintiffs at that time, Ms. Levorchick received an

inquiry from Hanna Mauritzson and Joseph Sorge in or around March of 2017 for the purchase of the Stallions.

32.   Ms. Levorchick never informed Plaintiffs about the inquiry she received from Ms. Mauritzson and Mr. Sorge for the Stallions.  Instead, Plaintiffs learned about the inquiry directly from Ms. Mauritzson on May 3, 2017.

**The Parties' Unconsummated Bill of Sale for the Stallions**

33.   After being told by Ms. Levorchick that no one was interested in the horses and that they were not likely to be sold, Plaintiffs preliminarily agreed to sell the Stallions to Ms. Levorchick for a discounted price.

34.   In March of 2017, Mr. Camaisa made a verbal agreement with Ms. Levorchick at the HITS Coachella Desert Circuit horse show on the general terms and conditions of the sale.

35.   Based on his understanding of the terms of the verbal agreement, Mr. Camaisa proceeded to reduce the agreement into a written Bill of Sale on March 21, 2017, with the full help of his assistant, Ms. Aileen Catapusan.

36.   A true and correct copy of the March 21, 2017 Bill of Sale offered by Mr. Camaisa is attached hereto as "Exhibit D."

37.   The Bill of Sale offered by Plaintiffs provided that Plaintiffs would agree to sell the Stallions to Ms. Levorchick for a combined price of $370,000.

38.   The Bill of Sale offered by Plaintiffs required that Ms. Levorchick pay a non-refundable down payment of $20,000 for the Stallions on the day of the Bill of Sale's execution.

39.   The Bill of Sale offered by Plaintiffs provided that Plaintiffs would take all necessary steps to transfer ownership and registration of the Stallions to Ms. Levorchick only upon confirmation of the $20,000 deposit payment.

40.   The Bill of Sale offered by Plaintiffs also provided that ownership of the Stallions shall transfer to Ms. Levorchick pending receipt of all payments.

41.   Mr. Camaisa executed the Bill of Sale under the express condition that

6

an addendum to the Bill of Sale would be executed on the same day.

42.     Ms. Catapusan emailed Ms. Levorchick with the Bill of Sale along with the Addendum to the Bill of Sale on March 21, 2017.

43.     On March 23, 2017, Ms. Levorchick responded to Ms. Catapusan's email by stating her understanding that the Addendum to the Bill of Sale would be a separate agreement from the Bill of Sale.  Ms. Levorchick further stated that the Addendum, as then-drafted, was inaccurate because the Addendum stated that another horse, Baloubina, was part of the sale.  Ms. Levorchick did not otherwise dispute that the parties had agreed to the contents of the Bill of Sale or the Addendum.

44.     Based on information and belief, Ms. Levorchick insisted that the Addendum be a separate agreement from the Bill of Sale because she never intended to sign or agree to the terms of the Addendum in the first place.

45.     On March 28, 2017, Ms. Catapusan sent the Bill of Sale and the Addendum as separate documents to Ms. Levorchick for her countersignature and her down payment of $20,000.

46.     In her March 28, 2017, email to Ms. Levorchick, Ms. Catapusan renamed the Addendum to "Agreement between Allan Camaisa (seller) and Tanya Levorchick (buyer)," per Ms. Levorchick's request.

47.     A true and correct copy of the March 28, 2017, email from Ms. Catapusan is attached hereto as "Exhibit E."

48.     Over the several weeks, Plaintiffs repeatedly asked Ms. Levorchick for the signed Addendum and the $20,000 deposit, but Ms. Levorchick ignored these attempts and did not respond.

49.     On April 18, 2017, Mr. Camaisa sent an email to Ms. Levorchick reiterating that he and Ms. Levorchick discussed at the HITS Coachella Desert Circuit horse show and at another point in time that the sale of the Stallions was conditioned on the agreements in the Addendum.

7

50.   Ms. Levorchick assured Ms. Camaisa by text message on April 22, 2107 that she would execute the Addendum and provide it to Ms. Camaisa the next day. Although Ms. Levorchick gave an envelope to Ms. Camaisa and told Ms. Camaisa that all of the required agreements were signed and in the envelope, Ms. Levorchick in fact only executed the Bill of Sale without executing the required Addendum.

51.   A true and correct copy of the Bill of Sale that Ms. Levorchick executed without the required Addendum is attached hereto as "Exhibit F."

52.   On May 3, 2017, Plaintiffs learned for the first time that Ms. Mauritzson and Mr. Sorge had made an inquiry to Ms. Levorchick during the HITS Coachella Desert Circuit horse show about buying the Stallions.

53.   Ms. Camaisa spoke to Ms. Mauritzson and learned that Ms. Levorchick told Ms. Mauritzson and Mr. Sorge that the Stallions were not available.

54.   After Mr. Camaisa did not receive from Ms. Levorchick the required signed Addendum or the required $20,000.00 deposit to be paid at the time the Bill of Sale and Addendum were signed, Ms. Camaisa told Ms. Levorchick on April 13, 2017, that Plaintiffs would not authorize USEF to transfer over title of the Stallions to Ms. Levorchick.

55.   Plaintiffs discovered later that Ms. Levorchick had no intent to execute the Addendum along with his signature.

56.   Ms. Levorchick had a far greater familiarity than Plaintiffs did with the equestrian world and horse market, and Mr. Camaisa relied in good faith that Ms. Levorchick would execute both agreements after he signed them simultaneously and sent them to her.

57.   Based on information and belief, Ms. Levorchick intended to deceive Plaintiffs since at least the time that they first discussed the proposed sale at the HITS Coachella Desert Circuit horse show.

58.   Plaintiffs were never told by Ms. Levorchick that she was not in full agreement of the Bill of Sale and the Addendum until a month after the Stallions

were shipped to the Czech Republic and Ms. Levorchick acquired possession of them.

59.    On May 3, 2017, Plaintiffs' counsel, Mr. William Eigner, wrote a letter to Ms. Levorchick demanding that Ms. Levorchick return the Stallions back to Plaintiffs' possession.  Mr. Eigner's letter also demanded that Ms. Levorchick pay for all the shipping and transportation costs of the Stallions, including quarantine costs, that she wrongfully incurred.  A true and correct copy of Mr. Eigner's demand letter is attached hereto as "Exhibit G."

60.    On May 5, 2017, after Mr. Camaisa demanded the Stallions be returned, Ms. Levorchick attempted to FEDEX Mr. Camaisa the $20,000 deposit.  This was more than 40 days after she took possession of the horses and had them shipped to the Czech Republic, knowing that Mr. Camaisa was not in agreement with terms of the sale.

61.    Mr. Camaisa rejected Ms. Levorchick's late payment and returned it to her by FEDEX the same day.

**Ms. Levorchick Falsified Documents to USEF to Transfer the Stallions' Ownership Registrations to Herself without Plaintiffs' Authorization, and USEF Knowingly Facilitated Ms. Levorchick's Fraud**

62.    In the first week of May 2017, Ms. Levorchick sent a rush request to USEF to transfer ownership with USEF and the Fédération Equestre Internationale ("FEI") for the Stallions.  Ms. Levorchick requested USEF to transfer the ownership registrations of the Stallions from Plaintiffs to herself.

63.    Along with this request, Ms. Levorchick provided a fraudulently signed USEF Ownership Affidavit, purportedly because Plaintiffs were not available to provide a signature.

64.    On May 8, 2017, Ms. Camaisa contacted USEF to state that the Stallions were transferred without her knowledge.

65.    Ms. Camaisa also made a formal protest to USEF's unauthorized transfer of the horses on May 6, 2017, to a USEF steward at the Del Mar National

9

Horse Show.

66.     After USEF Legal Counsel reviewed this case, Mr. Ken Ball of USEF wrote an email to Ms. Camaisa and Ms. Levorchick informing them that the Stallions would be transferred back to the Plaintiffs' ownership, since Ms. Camaisa was "available" to sign for a transfer of ownership.

67.     Mr. Ball's email further instructed the parties to settle their issues between themselves before any ownership transfer could take place.

68.     Ms. Levorchick failed to disclose to USEF that she had never paid any money for the Stallions and that she did not sign the required addendum to the Bill of Sale.

69.     Ms. Levorchick failed to disclose to USEF that she obtained Mr. Camaisa's signature on the Bill of Sale via fraud.

70.     Ms. Levorchick failed to disclose to USEF that Plaintiffs never received the required deposit of $20,000 at the time the Bill of Sale was signed or the required side agreement to the Bill of Sale.

71.     Subsequently, on May 11, 2017, Ms. Kristin Posner of USEF emailed both Ms. Camaisa and Ms. Levorchick, stating that the ownership of the Stallions could not be transferred until the signatures were received from Ms. Camaisa on the Code of Conduct and release forms.

72.     In response on that same day, Ms. Camaisa emailed Ms. Posner of USEF, advising that she was not authorizing the release of ownership and that Ms. Levorchick had sent in paperwork without Ms. Camaisa's knowledge.  Ms. Camaisa notified Ms. Posner that because Ms. Levorchick failed to make the down payment of $20,000 by March 21, 2017, the Bill of Sale was invalid and not consummated. Further, Ms. Camaisa informed Ms. Posner that the Bill of Sale was invalid and not consummated because her signature was not on the Bill of Sale.

73.     On May 17, 2017, Plaintiffs' counsel, Lisel Ferguson, contacted Ms. Susan Gilbert at the USEF Legal Department and advised that the ownership should

not be transferred because there was a dispute and fraudulent signatures affixed to documents.

74.     Ms. Ferguson also left a detailed message for Sonja Keating SVP, General Counsel on May 17, 2017.   Ms. Ferguson received a call back from Ameilia Sandot and spoke with her on May 19, 2017.  Once again, Ms. Ferguson advised that the titles to the Stallions should not be transferred as the Plaintiffs are the rightful owners and the signatures that were provided by Ms. Levorchick were fraudulent, as Plaintiffs never authorized Ms. Levorchick to sign any document on her behalf.

75.     On May 19, 2017, Mr. Ball emailed Ms. Camaisa and Ms. Levorchick to inform them that USEF processed Ms. Levorchick's ownership transfer and listed the Stallions in the USEF database as being owned by Ms. Levorchick.  Mr. Ball further stated that USEF would be mailing the FEI passports for the Stallions to Ms. Levorchick.

76.     Despite being repeatedly advised by Plaintiffs and their counsel that the Stallions should not be transferred to Ms. Levorchick, USEF nevertheless proceeded to transfer the FEI Registrations to Ms. Levorchick.

77.     On June 9, 2017, Ms. Ferguson wrote a letter to USEF demanding that USEF transfer the Stallions' FEI Registrations and FEI passports back to Plaintiffs and correct the owner information in their records.

78.     To date, USEF has not responded to Ms. Ferguson's letter from June 9, 2017.

79.     Ms. Levorchick recently transported Plaintiffs' Stallions, along with Plaintiffs' riding tack and supplies, out of the United States and to the Czech Republic.

## FIRST CAUSE OF ACTION

### (Breach of GSA under California Law against Defendant Ms. Levorchick)

80.     Plaintiffs incorporate by reference paragraphs 1 through 79 above as though the same were set forth in full herein.

81.     Plaintiff CML and Defendant Ms. Levorchick entered into a GSA.

82.     CML did all, or substantially all, of the significant things that the GSA required it to do, except for those things which it was excused from doing.

83.     All conditions required by the GSA for Ms. Levorchick's performance had occurred or were excused.

84.     Ms. Levorchick failed to use best efforts to show the Stallions in effort to solicit inquiries for eventual sale to the highest bidder, as the GSA required her to do.

85.     Ms. Levorchick also failed to submit in writing to Plaintiffs all inquiries for the eventual sale of the Stallions to the highest bidder, as the GSA required her to do.

86.     For example, Ms. Levorchick failed to inform Plaintiffs, in writing or otherwise, that Ms. Mauritzson and Mr. Sorge were interested in purchasing the Stallions from Plaintiffs.

87.     Plaintiffs were harmed by Ms. Levorchick's failure to perform under the General Services Agreement.

## SECOND CAUSE OF ACTION

**(Promissory Estoppel under California Law against Defendant Ms. Levorchick)**

88.     Plaintiffs incorporate by reference paragraphs 1 through 87 above as though the same were set forth in full herein.

89.     Ms. Levorchick promised Plaintiffs that she would pay a $20,000 non-refundable down payment on March 21, 2107, for the sale of the Stallions, in order to fully form a contract under the proposed Bill of Sale.

90.     Ms. Levorchick also promised Plaintiffs that she would sign the Addendum, in order to fully form a contract under the proposed Bill of Sale.

91.     Ms. Levorchick's promises would be reasonably expected to induce Plaintiffs' reliance.

92.     Plaintiffs did indeed take detrimental action in reliance on Ms.

12

Levorchick's promises by allowing the Stallions to be shipped back to the Czech Republic before any ownership transfer occurred.

93.    Injustice can be avoided only by enforcement of the promise.

## THIRD CAUSE OF ACTION

**(Breach of Implied Covenant of Good Faith and Fair Dealing under California Law against Defendant Ms. Levorchick)**

94.    Plaintiffs incorporate by reference paragraphs 1 through 93 above as though the same were set forth in full herein.

95.    CML and Ms. Levorchick entered into a GSA.

96.    CML did all, or substantially all of the significant things that the GSA required it to do, except for those things which it was excused from having to do.

97.    All conditions required for Ms. Levorchick's performance had occurred or were excused.

98.    Ms. Levorchick unfairly interfered with CML's right to receive the benefits of the GSA by, among other things, failing to use her best efforts to solicit inquiries for the sale of Plaintiffs' horses and failing to inform Plaintiffs about an inquiry from Ms. Mauritzson and Mr. Sorge for the purchase of the Stallions.

99.    CML was harmed by Ms. Levorchick's conduct.

## FOURTH CAUSE OF ACTION

**(Fraudulent Misrepresentation under California Law against Defendant Ms. Levorchick)**

100.    Plaintiffs incorporate by reference paragraphs 1 through 99 above as though the same were set forth in full herein.

101.    Ms. Levorchick represented to USEF that she was authorized to take ownership and possession of the Stallions from Plaintiffs.

102.    Ms. Levorchick's representation to USEF was false.

103.    Ms. Levorchick either knew that her representation to USEF was false when she made it, or she made the representation recklessly and without regard for

1   its truth.

2   104.   Ms. Levorchick intended that USEF would rely on the representation to

3   Plaintiffs' detriment.

4   105.   USEF reasonably relied on Ms. Levorchick's representation.

5   106.   Despite being repeatedly advised by Plaintiffs and their counsel that the

6   Stallions should not be transferred to Ms. Levorchick, USEF nevertheless proceeded

7   to transfer the FEI Registrations to Ms. Levorchick.

8   107.   As a result of Ms. Levorchick's representation to USEF, USEF

9   transferred the FEI Registrations for the Stallions from Plaintiffs to Ms. Levorchick.

10   108.   Plaintiffs were harmed by Ms. Levorchick's misrepresentation to USEF.

11   109.   USEF's reliance on Ms. Levorchick's representation was a substantial

12   factor in causing Plaintiffs' harm.

13   ## FIFTH CAUSE OF ACTION

14   **(Fraudulent Concealment under California Law against Defendant Ms.**

15   **Levorchick)**

16   110.   Plaintiffs incorporate by reference paragraphs 1 through 109 above as

17   though the same were set forth in full herein.

18   111.   Ms. Levorchick and CML were in a business relationship such that Ms.

19   Levorchick was contractually obligated to use her best efforts to show the Stallions

20   in an effort to solicit inquiries for eventual sale to the highest bidder, as well as to

21   submit all such inquiries in writing to Plaintiffs.

22   112.   Ms. Levorchick intentionally failed to disclose to Plaintiffs, in writing

23   or otherwise, that Ms. Mauritzson and Mr. Sorge had made an inquiry into

24   purchasing the Stallions.

25   113.   Plaintiffs did not know that Ms. Mauritzson and Mr. Sorge were

26   interested in purchasing the Stallions before they signed the Bill of Sale.

27   114.   Ms. Levorchick intended to deceive Plaintiffs by concealing the fact

28   that Ms. Mauritzson and Mr. Sorge were interested in purchasing the Stallions.

14

115.   Plaintiffs reasonably relied on Ms. Levorchick's deception.

116.   Plaintiffs were harmed by Ms. Levorchick's deception.

117.   Ms. Levorchick's concealment was a substantial factor in causing Plaintiffs' harm.

## SIXTH CAUSE OF ACTION

**(Conversion of the Stallions under California Law against Defendant Ms. Levorchick)**

118.   Plaintiffs incorporate by reference paragraphs 1 through 117 above as though the same were set forth in full herein.

119.   Plaintiffs are the rightful owners of the Stallions.

120.   Plaintiffs and Ms. Levorchick never entered into a fully executed agreement to transfer ownership of the Stallions to Ms. Levorchick.

121.   Plaintiffs have never authorized USEF to transfer the FEI Registrations to Ms. Levorchick.

122.   Ms. Levorchick intentionally and substantially interfered with Plaintiffs property by taking possession of the Stallions and/or preventing Plaintiffs from having access to the Stallions.

123.   Ms. Levorchick has refused to return the Stallions to Plaintiffs despite Plaintiffs' having demanded their return.

124.   Plaintiffs did not consent to Ms. Levorchick's taking possession of the Stallions.

125.   Plaintiffs have been harmed by Ms. Levorchick's taking possession of the Stallions without Plaintiffs' authorization.

126.   Ms. Levorchick's conduct was a substantial factor in causing Plaintiffs' harm.

## SEVENTH CAUSE OF ACTION

**(Conversion of the Riding Tack and Supplies under California Law against Defendant Ms. Levorchick)**

15

127.   Plaintiffs incorporate by reference paragraphs 1 through 126 above as though the same were set forth in full herein.

128.   Plaintiffs are the rightful owners of the riding tack and supplies used for the Stallions.

129.   Plaintiffs and Ms. Levorchick never entered into any agreement to transfer ownership of the riding tack and supplies used for the Stallions to Ms. Levorchick.

130.   Ms. Levorchick intentionally and substantially interfered with Plaintiffs property by taking possession of the riding tack and supplies used for the Stallions and/or preventing Plaintiffs from having access to the riding tack and supplies used for the Stallions.

131.   Ms. Levorchick has refused to return the riding tack and supplies used for the Stallions to Plaintiffs despite Plaintiffs' having demanded their return.

132.   Plaintiffs did not consent to Ms. Levorchick's taking possession of the riding tack and supplies used for the Stallions.

133.   Plaintiffs have been harmed by Ms. Levorchick's taking possession of the riding tack and supplies used for the Stallions without Plaintiffs' authorization.

134.   Ms. Levorchick's conduct was a substantial factor in causing Plaintiffs' harm.

## EIGHTH CAUSE OF ACTION

### (Intentional Infliction of Emotional Distress under California Law against Defendant Ms. Levorchick)

135.   Plaintiffs incorporate by reference paragraphs 1 through 134 above as though the same were set forth in full herein.

136.   Ms. Levorchick's conduct was outrageous, in that she had a relationship with Plaintiffs that gave her real or apparent power to affect Plaintiffs' interests in their Stallions, and she abused this relationship knowing that her conduct would likely result in harm due to mental distress.

16

137.   Ms. Levorchick either intended to cause Plaintiffs emotional distress, or she acted with reckless disregard for the probability that Plaintiffs would suffer emotional distress, knowing that Plaintiffs were present when the conduct occurred.

138.   Plaintiffs suffered, and continue to suffer, severe emotional distress, including suffering, anguish, fright, horror, nervousness, grief, anxiety, worry, shock, humiliation, and shame.

139.   Ms. Levorchick's conduct was a substantial factor in causing Plaintiffs' severe emotional distress.

## NINTH CAUSE OF ACTION

### (Negligence under California Law against Defendant USEF)

140.   Plaintiffs incorporate by reference paragraphs 1 through 139 above as though the same were set forth in full herein.

141.   USEF had a general duty to use reasonable care to prevent harm to Plaintiffs.

142.   In the first week of May 2017, Ms. Levorchick sent a rush request to USEF to transfer the ownership registrations of the Stallions from Plaintiffs to herself.

143.   Along with this request, Ms. Levorchick provided a fraudulently signed USEF Ownership Affidavit, purportedly because Plaintiffs were not available to provide a signature.

144.   Ms. Camaisa subsequently contacted USEF to formally protest that the Stallions were transferred without her knowledge.

145.   Ms. Camaisa further informed USEF that although she was available for signature, but Ms. Levorchick fraudulently signed the USEF Ownership Affidavit knowing that Plaintiffs did not authorize the ownership transfer.

146.   Despite being repeatedly advised by Plaintiffs and their counsel that the Stallions should not be transferred to Ms. Levorchick, USEF nevertheless proceeded to transfer the FEI Registrations to Ms. Levorchick.

147.   USEF's conduct in handling Ms. Levorchick's request to transfer ownership of the Stallions was negligent.

148.   Plaintiffs have been harmed by USEF's conduct by being wrongfully deprived of the Stallions ownership Registrations.

149.   USEF's negligence was a substantial factor in causing Plaintiffs' harm.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for judgment against Defendants, and each of them, as follows:

**ON ALL CAUSES OF ACTION:**

1.   For replevin of the Stallions and their ownership registrations from Ms. Levorchick to Plaintiffs;

2.   For specific performance of the Bill of Sale;

3.   For general and special damages in a sum according to proof at trial;

4.   For an award of damages equal to the profit realized from Defendants' conduct, as alleged;

5.   For prejudgment interest thereon according to law;

6.   For punitive damages pursuant to Civil Code § 3294;

7.   For costs of suit incurred herein;

8.   For attorneys' fees; and

9.   For such other and further relief as the Court deems just and proper.

DATED: June 28, 2017          PROCOPIO, CORY, HARGREAVES & SAVITCH LLP


By: /s/ Lisel M. Ferguson
Lisel M. Ferguson
Anthony J. Dain
Matthew B. Shields

*Attorneys for Plaintiffs*

DOCS 109501-000007/2959648.1

1

# <u>DEMAND FOR JURY TRIAL</u>

2
Plaintiffs ALLAN CAMAISA, MEGAN CAMAISA, and CHESTER

3
MEADOWS, LLC respectfully request a jury trial.

4

5
DATED: June 28, 2017              PROCOPIO, CORY, HARGREAVES &
                                            SAVITCH LLP

6

7
By:  /s/ Lisel M. Ferguson

8
      Lisel M. Ferguson
      Anthony J. Dain
      Matthew B. Shields

9

10
*Attorneys for Plaintiffs*

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28